[No. 21415. Department Two. November 5, 1928.]
THE STATE OF WASHINGTON, *Respondent*, v.
W. J. POWERS *et al.,* *Appellants.*[1]

*Fred C. Brown* and *Robbins & Rickles,* for appellants.

*Ewing D. Colvin* and *James M. Bailey,* for respondent.

ASKREN, J.—Both defendants were charged with having, on August 27, 1927, in King county, Washington, the possession of intoxicating liquor, with intent to sell the same. They were tried and convicted in justice court. On appeal to the superior court, they were tried again, convicted by the court without a jury, and sentence was imposed. This appeal followed.

The facts necessary to a determination of the points involved are: Both appellants run soft drink parlors, confectionery and pool room establishments in Se-

[1]Reported in 271 Pac. 584; 274 Pac. 192.

attle. They both serve, across the counter or bar, in their places of business, Abbott's Bitters. This concoction comes from the manufacturer in bottled form, and is not prohibited by the Federal government under the Volstead act. The ingredients include emodin, herbs, mineral oils, and it has a laxative effect if two or more drinks are taken. Abbott's Bitters have been sold on the market for a great number of years and contain from thirty-three to fifty per cent alcohol. In the appellants' places of business, it is sold over the counter in small whiskey glasses at twenty-five cents per drink, and is commonly asked for under the name "ink" or "black stuff". The bottles containing the liquid are kept in plain view by the appellants, and they have made no attempt to conceal their supply or the sale of the same. Their places are run as legitimate places for the sale of candy, soft drinks, etc. Their reputations in the community are good, and their sale of bitters was made in the belief that they had a right to sell the same, and that when so sold there was no violation of the law.

The first point urged is that the complaint did not state a crime, because it failed to charge that the intoxicating liquor was "capable of being used as a beverage."

The argument is based upon our previous holding in *State v. Hemrich*, 93 Wash. 439, 161 Pac. 79, L. R. A. 1917B 962, and *State v. Kassis*, 138 Wash. 141, 244 Pac. 396, where the statute defining intoxicating liquor, Rem. Comp. Stat. §7307, was arbitrarily divided into three classes, for the purpose of consideration, as follows:

"Our statutory definition was clearly intended to define as intoxicating liquors three distinct groups: (1) Whiskey, brandy, gin, rum, wine, ale, beer and any spirituous, vinous, fermented or malt liquor; (2) every other liquor or liquid containing intoxicating proper-

ties which is capable of being used as a beverage, whether medicated or not; (3) all liquids, whether proprietary, patented or not, which contain any alcohol which are capable of being used as a beverage. The first group defines, *eo nomine,* as intoxicating liquors certain specific liquids without reference to their properties, because they are all liquors which are generally understood to contain alcohol in some quantity. The second group merely adds to the things prohibited another class of prohibited liquors with no description save the *intoxicating* quality. The third group adds still another class to the things already prohibited, namely, liquids whether proprietary or not, describing them by their *alcoholic* property. The words 'every other liquor or liquid containing intoxicating properties' qualify nothing else, but describe and add another class to the things the sale and manufacture of which are prohibited. The clause quoted was intended to add and include, not to limit or restrict.''

It is said that, since the liquors named in class one are those that are generally known to be and accepted as liquids with intoxicating properties, and therefore capable of being used as a beverage, an information need not state the particular kind of liquor, nor its capability of being used as a beverage, if it be in fact one of those enumerated in class one. But the argument proceeds, if it be a liquid falling under the designated classes two or three, the information must name either the liquid or its capability of use as a beverage or both.

The argument is fairly persuasive, but we have already held contrary to appellants' contention. In *State v. Catalino,* 118 Wash. 611, 204 Pac. 179, we held that an information charging one with "possession of intoxicating liquor other than alcohol," was fatally defective, because it did not allege the kind of intoxicating liquor, nor its capability of use as a beverage. However, that decision was challenged as unsound

512

and explicitly overruled in *State v. Misetrich,* 124 Wash. 470, 215 Pac. 13, where, in a prosecution for "maintaining a joint," we held that a charge of illegal possession of liquor need not contain any allegation of its use as a beverage. The main ground of the decision in that regard was that the information was in the language of the statute which made it "unlawful for any person . . . to have in his possession any intoxicating liquor other than alcohol." An information in the language of the statute is sufficient if the statute defines the crime.

Here the prosecution is under Laws of 1927, ch. 98, p. 82, §1; Rem. 1927 Sup., §7309, which amended Rem. Comp. Stat., §7309, and appellants are charged in the words of the statute. It reads as follows:

"Section 4. It shall be unlawful for any person to manufacture, sell, barter, exchange, give away, furnish or otherwise dispose of any intoxicating liquor, or to keep any intoxicating liquor, with intent to sell, barter, exchange, give away, furnish or otherwise dispose of the same, except as in this act provided."

We think the information was sufficient.

It is next urged that the evidence did not show that Abbott's Bitters is an intoxicating liquor, and that it is capable of being used as a beverage. The question of whether a given liquid is capable of being used as a beverage, manifestly, is a question of fact. There is no marked dividing line between those liquids which are generally known to be for beverage purposes and those which are strictly non-beverage. It should be noticed at the outset, in determining this question, that the statute defining intoxicating liquors does not classify the liquids as "beverages," but includes within its scope liquids that are "capable of being used as a beverage." This is a very broad term and must include within its purview those liquids which, although not generally considered as bever-

ages, are yet capable of being so used. This must necessarily be so when we consider that the purpose of initiative measure No. 3 was to prohibit the sale of intoxicating liquor. In doing so, it was realized that many persons accustomed to ordinary intoxicants would turn to other liquids for a substitute. It might be that the other liquids would not be so palatable and have after effects somewhat undesirable, but whether these things would be sufficient to deter the person from drinking them would depend to a large extent upon the individual. Keeping in mind, then, the purpose of the statute and its wide scope, it is easily seen that there is a large zone within which there fall many liquids theretofore generally associated in the public mind with wholly non-beverage drinks.

Abbott's Bitters is shown by the evidence to come within this class. The record discloses testimony showing that, prior to prohibition in this state, many saloons kept these bitters on hand, not for strictly drinking purposes, but rather for their laxative effect. There is also evidence that they are so used by many persons at the present time for the same purpose. On the other hand, the testimony discloses that it is used also for beverage purposes. The fact that it is sold by the drink, in whiskey glasses, in soft drink establishments, negatives to a great extent the idea that it is drunk for its medicinal effect; the extent of its use is also material in determining the purpose of its consumption; the testimony of certain witnesses who had partaken of some of the liquid that it was capable of being used as a beverage; that customers did not ask for it as bitters, or as a laxative, or medicine, but referred to it as "ink" or "black stuff"; and the label on the bottles indicating its use as a beverage, are all material factors in an inquiry into its beverage use.

In this connection it may be proper to say that the label upon the bottles includes, among its suggested uses,

"Few drops in disagreeable medicines make them more palatable without counteracting their medicinal effect . . . These bottles have gained a wide reputation for imparting bouquet to plain and fancy drinks, iced tea, lemonade, ginger-ale, plain soda, grape juice, etc. Use 2 to 20 drops. Delightful flavor for a sherbet, wine jelly, such soups as mock turtle, etc."

The general rule concerning the sale of liquids like the one here under consideration is well stated in 33 C. J. 493:

"The various infusions called 'bitters,' containing alcohol together with bitter herbs, barks, or other medicinal ingredients, have been held subject to laws regulating the sale of intoxicating liquors, if, notwithstanding the presence of the medicinal ingredients, they are capable of being used as beverages and contain sufficient alcohol to produce intoxication when so used; but not if they are incapable of being used as drinks and where the alcohol is merely a necessary preservative or vehicle for the other constituents."

The question is not a new one, in any sense of the word. Many cases will be found where almost the identical situation was presented to the court, and the holding invariably is that the question of whether a given liquid is capable of use as a beverage, is one of fact.

In *State v. Johnson,* 113 S. C. 350, 101 S. E. 851, a grocer was convicted of selling intoxicating liquor upon evidence which showed that he sold to his customers bottles containing non-intoxicating cider. He also sold them bottles of lemon extract or Jamaica ginger. They poured either the extract or ginger into the cider, and drank the compound. It then became intoxicating. The defendant contended in that action

that the extract was a food, and the ginger a medicine, and that he therefore had a right to sell the same; but the court said:

"The questions were questions of fact. If the liquids sold were used as a beverage, and contained the prohibited percentage of alcohol, then their sale was unlawful, if the seller knew that they were bought for that purpose. Were they so bought and used? That was a question for the jury. Even the Jamaica ginger, which ordinarily is used as a medicine, yet if sold as a beverage, the sale was unlawful. Was it so sold? That was also a question for the jury. The statutes forbade the sale of intoxicating liquors, by whatever name called, and that is just what Judge Rice told the jury."

In *State v. National Selright Ass'n.*, 192 Iowa 629, 185 N. W. 145, an action was prosecuted against certain druggists, who sold what was called Old Reserve and Beef, Iron and Wine, liquids containing about twenty per cent alcohol. It was contended that the liquids were medicinal. The court held that whether they were so compounded as to destroy their use as a beverage, was a question of fact. The defendants also sought, in that case, to have the court construe the words, "capable of being used as a beverage," to mean those liquids which the individual of average taste would use as a beverage. The court expressly refused to so hold, saying:

"Appellant's next proposition is stated thus: Is the term 'capable of being used as a beverage' to be applied in cases of the average individual with average tastes, or otherwise? And the argument is that the term 'beverage' is defined as a liquid for drinking, artificially prepared, and of an agreeable flavor; that it is used to distinguish the act of drinking liquor for the mere pleasure of drinking, from its use for medicinal purposes. It is therefore contended that, before the court could find that the different tonics seized are beverages, or capable of being used as

beverages, it must be found that a man of average tastes would drink Old Reserve for the pleasure of drinking it, as readily as he would drink a cup of coffee, etc. We assume that appellant's meaning is that a so-called white liner, who might find it necessary to drink pure alcohol or carbolic acid before he could taste it, would drink liquid containing alcohol, even though it was medicated to some extent, whereas new recruits would not drink it. The class first mentioned is gradually dying off, or becoming bleached out for lack of sustenance. The coming generation may not so readily acquire the habit to the extent indicated. Under the first definition suggested by appellants, pure alcohol or straight whiskey might not have an agreeable flavor to many; and yet no one would claim that it could not be used as a beverage, within the meaning of the liquor laws. There is no evidence in the record to show what an 'average' taste would be. It might be difficult to determine; but, after all, the law makes no distinction in tastes, or between individuals with an intense thirst and those whose desire is not so well developed."

The question in the present case was one of fact and there being sufficient evidence to support the judgment it must stand.

Other errors urged do not require detailed discussion.

Judgment affirmed.

FULLERTON, C. J., PARKER, FRENCH, and MAIN, JJ., concur.

### ON REHEARING.

[*En Banc.* February 11, 1929.]

PER CURIAM.—Upon a rehearing *En Banc*, a majority of the court adheres to the Departmental opinion heretofore filed herein.

Judgment affirmed.